**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

**DANIEL GILBERTSON**
**MATTHEW WALSH**
**MATTHEW BRAESCH,**

**On Behalf of Themselves and All Others**
**Sharing a Question of Common and General Interest;**

        **Plaintiffs;**

    **v.**                          **Case No. 2:15-CV-00139**

**CITY OF SHEBOYGAN,**

        **Defendant**

---

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

---

## I.     Introduction.

The motion for summary judgment on liability presents the Court with three separate questions of law. First is whether payments made by the City to the Plaintiffs must be included in the regular rate for overtime pay. The parties stipulated that the education bonus and health insurance opt-out payment should be included in calculating the regular rate. (Stipulated Conclusion of Law, ¶1) Performance bonuses whose payment are either mandatory, or depend on the evaluation of objective factors must be included in the regular rate. Payments made by the City to reimburse employees for their medical expenses must be included in the regular rate when they reimburse expenses incurred by employees for their own benefit; and are not payments to a third party or trustee to provide health insurance or similar fringe benefits.

1

The second legal question is whether the Plaintiffs must comply with the notice of claim procedure prior to filing suit for unpaid wages under Chapter 109 of the Wisconsin statutes. Chapter 109 is fundamentally incompatible with the notice of claim requirement because imposing the notice of claim requirement would remove the employer's incentive to promptly pay owed wages, would prevent recovery by all similarly situated employees unless they affirmatively opt to participate in the lawsuit pre-suit, and may require employees to pay costs out of their wage recovery in direct violation of §109.03(6). The notice of claim procedure is thus overridden by the specific Chapter wage claim procedure, and is inapplicable.

The third legal question before the Court is whether the City violated Wis. Stat. §102.16(3) when it transferred surplus monies from the health insurance fund, including monies deducted from employee wages, into the workers compensation fund. The City violated the statute by making deductions from employee wages, and then indirectly transferring some of those deducted wages to its workers compensation fund for the purpose of covering its workers compensation expenses. There is also evidence the City artificially inflated its health insurance premiums so that surplus premiums can be used to pay its workers compensation liabilities. Since indirect wage deductions used for the purpose of paying workers compensation expenses cannot constitute the payment of bona fide wages to employees, the Plaintiffs have not received the full amount of wages promised by the City, in violation of Wis. Stat. §109.03(1) and (5).

## II.      Argument.

I.      <u>Payments Made by the City of Sheboygan to the Plaintiffs Must be Included in the Regular Rate to Compute Overtime Pay</u>.

Pursuant to 29 U.S.C. §207(a), overtime pay for hours worked more than 40 hours per week must be paid at a rate not less than one and one half times the regular rate at which the

2

employee is employed. Under §207(e), the regular rate includes all remuneration for employment paid to, or on behalf of the employee, except for the types of payments listed in §207(e)(1) through (8). These exceptions should be construed narrowly against the employer. *O'Brien v. Town of Agawam*, 350 F. 3d 279, 297 (1[th] Cir. 2001); *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1015 (N.D. IL. 2013). Since none of the payments at issue made by the City of Sheboygan to the Plaintiffs fall within the exceptions, the Plaintiffs are entitled to summary judgment on the overtime calculation issue in its entirety.

      a.   <u>The 2012 Merit Bonus Payments Must be Included in the Regular Rate</u>.

In 2011, the City decided to implement a new system of tying pay to performance reviews. (Proposed Facts, ¶1) During the transition year of 2012, the City decided to grant wage increases to everyone, rather than tie the increases to individual employee performance reviews. (Proposed Facts, ¶1-2) The increases were required by the City's Compensation Plan, which has the same legal effect as a resolution adopted by the City's Common Council. (Proposed Facts, ¶4) As a result, in 2012 the employees receive the increases in the form of either a lump sum or a wage increase, depending on where they were on the pay scale for their respective positions. (Proposed Facts, ¶3, Stipulated Facts, ¶1) Only employees employed by the City as of the date the lump sums were paid received the respective lump sum payments. (Proposed Facts, ¶2; Stipulated Facts, ¶2) The 2012 wage increases were included by the City in calculating the employees' regular rate for overtime pay; while the 2012 lump sum payments were excluded by the City from the calculation of the employee's regular rate for overtime pay. (Stipulated Facts, ¶1, 7)

3

The mandatory lump sum payments in 2012 were granted to the Plaintiffs in lieu of merit based increases they may earn in future years; and therefore clearly constitute additional compensation for services performed for the City. For 2012, the lump sum payments were required by the City's Compensation Plan, which has the same binding effect as a resolution adopted by the City's Common Council. (Proposed Facts, ¶5) The mandatory nature of the bonuses also establishes that they are not gifts covered by §207(e)(1). *White v. Publix Super Markets*, 2015 U.S. Dist. Lexis 109670 *10 (E.D. TN. 2015). A mandatory bonus, paid as additional compensation for services rendered, must be included in the regular rate for overtime pay. *McComb v. Shepard Niles Crane & Hoist Corp*., 171 F. 2d 69 (2nd Cir. 1948).

Moreover, only employees who remained employed with the City in January and July of 2012 were eligible to receive the lump sum bonus payments. A payment that incentivizes the employee to remain employed until the bonus payment date is a payment for services. *Dietrick v. Securitas Sec. Servs.*, 50 F. Supp. 3d 1265, 1273 (N.D. CA. 2014). The 2012 mandatory lump sum payments therefore must be included in the regular rate calculation.

   b.  <u>Merit Bonus Payments in 2013 and Thereafter Must be Included in the Regular Rate</u>.

For the years of 2013 and thereafter, the City conducted an annual review of each non-represented employee on criteria such as the quality and quantity of work, job knowledge, attendance, safety, and dependability; resulting in an overall rating. (Proposed Facts, ¶6) Employees are additionally reviewed on the degree that they have met the specific goals for the year set for them by their supervisors. (Proposed Facts, ¶7) In the years of 2013 and thereafter, a lump sum payment of some amount was paid to all employees who were already at the top of their pay scales, and received a rating of "successfully achieved" or "exceeds" on their

4

performance review. (Stipulated Facts, ¶3) Similarly, each employees who were at the midpoint of their pay scales or higher, and received a rating of successfully achieved or exceeds on achieving their individual goals received a lump sum payment of some amount. (Stipulated Facts, ¶5) The lump sums were paid in lieu of wage increases paid to employees who were lower on the pay scale. (Stipulated Facts, ¶4, 6) The wage increases, but not the lump sums, were then included by the City when calculating its employees' regular rate for overtime pay. (Id., ¶4, 6-7)

Each of the City's Compensation Plans for the years of 2013 to 2015 provided that: "Department heads may deny or delay merit adjustments if employees are not performing in a fully capable manner. When merit adjustments are delayed or denied, a plan of action for improvement and a target date shall be set by the supervisor". (Proposed Facts, ¶8)

29 C.F.R. §778.211(c), the administrative regulation promulgated by the Department of Labor to implement the §207(e)(3) exemption for discretionary bonus payments, provides in relevant part:

> Bonuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay.

Applying the regulation, courts have consistently held that payments to employees for meeting performance objectives must be included in the regular rate, even if the payments are not guaranteed. *Alonzo v. Maximus Inc.*, 832 F. Supp. 2d 1122, 1131-1133 (C.D. CA. 2011) (Bonus paid to employee for meeting numerical goals, as an incentive for the employees to work more steadily, rapidly, or efficiently, must be included in the regular rate calculation even if not guaranteed); *Gonzalez v. McNeil Tech. Inc.*, 2007 U.S. Dist. Lexis 27262 *13 (E.D. VA. 2007)

5

(Once a bonus has been promised to employees as an inducement for achieving some business goal, the bonus must be included in the regular rate even if the payment of the bonus is contingent on other factors, and is not guaranteed). The reason for the rule is that a bonus that is a part of the employee's compensation to encourage him to work better, rather than a true gratuity, must be included in the regular rate. *McLaughlin v. McGee Bros. Inc.*, 681 F. Supp. 1117, 1133-1134 (W.D. N.C. 1988).

Similarly, in each year beginning in 2013 the City of Sheboygan set both general (in the form of a performance review) and specific goals for each of its employees. (Proposed Facts, ¶6-7) Each employee who received a rating of "Satisfactorily achieved" or better, and who is high enough on the pay scale to receive payment as a lump sum rather than a wage increase, received a lump sum payment of some amount from the City. (Stipulated Facts, ¶3, 5) The lump sums therefore are to compensate employees for improving their work performance as evaluated on objective criteria, rather than a true gratuity. Under §778.211(c) and case law, the lump sums must be included in the regular rate even if their payment is not guaranteed.

Moreover, under 29 U.S.C. §207(e)(3) a bonus paid in recognition of services performed can be excluded from the regular rate, only if both the fact of payment *and* amount of payment are discretionary. Moreover, the employer must retain discretion until quite close to the end of the time period for which the bonus is to be paid. 29 C.F.R. §778.211(b). By agreeing ahead of time that bonuses of some amount would be paid for achieving defined performance standards, the City has surrendered its discretion on whether to pay the bonuses to the employees. *Alonzo*, 832 F. Supp. 2d at 1131 (Employer surrendered discretion when it announced that bonuses would be paid for meeting defined performance thresholds).On the other hand, the City's

6

Compensation Plan announced near the beginning of each year that a merit adjustment can only be delayed or denied for employees who failed to attain a "successfully achieved" rating, and requires putting employees whose merit adjustment has been delayed or denied on a performance improvement plan. (Proposed Facts, ¶8)  The Compensation Plan thus required the City to provide a lump sum payment of some amount to each employee who was sufficiently high on the pay scale, and received a rating of at least "successfully achieved" on their evaluation.  In practice, a lump sum payment of some amount was paid to all employees who achieved a rating of 'satisfactorily achieved" or better on either their annual review, or their achievement of individual goals. (Stipulated Facts, ¶3, 5)

The employees would be evaluated around the time of their anniversary dates; and if successful would receive lump sum payments for the 12 months preceding the evaluation. (Proposed Facts, ¶5)  For example, if an employee's anniversary date is in July, and he is evaluated and receives a lump sum payment in July of 2013, the City had surrendered its discretion on whether to pay him a lump sum payment of some amount for achieving the successful rating when it passed the 2013 Compensation Plan near the beginning of the year, and long before the end of the time period covered by the lump sum payment.  Moreover, since each compensation plan was retroactively applied to January 1st of the year that it covered (Proposed Facts, ¶8), even for employees who were evaluated and retroactively received lump sum payments in January of any given year, the City had surrendered its discretion to pay a lump sum payment of some amount on January 1st, and before the end of the time period covered by the lump sum payment.  The 2013-2015 lump sum payments for job performance therefore must be

7

included in the Plaintiffs' regular rate, regardless of whether the City retained discretion to determine the amount of the bonuses.

        c.      <u>Health Reimbursement Account Payments Made by the City are not Included in §207(e)(4), and Therefore Must be Included in the Regular Rate Computation</u>.

In both 2012 and 2013, the City made available to its employees a Health Reimbursement Account to cover some of their medical and related expenses. (Proposed Facts, ¶9) According to the Plan Document for the HRA program, payments are made by the City either directly to the employee, or are made to the service provider. (Proposed Facts, ¶10) If applicable, the payments must be used to pay a portion of the employee's deductible. (Proposed Facts, ¶12) In practice, the third party administrator for the HRA program, Diversified, would directly pay the costs covered by the HRA. Diversified would then invoice the City for the amount that it paid. (Proposed Facts, ¶11) The City would then use money from its general account to reimburse Diversified. (Proposed Facts, ¶13)

Employer payments to its employee to reimburse the employee for medical expenses, in lieu of providing medical insurance to the employee, must be included in calculating the regular rate for overtime pay. 1985 DOLWH Lexis 13. Similarly, in this case the City has decided to have a higher insurance deductible, and then uses the HRA payments to reimburse the employee for a portion of his deductible costs. (Id. ¶12) The HRA payments constitute a form of expense reimbursement, rather than employer contributions toward health insurance.

The City's HRA reimbursement payments cannot be treated as exempt under §207(e)(4), because they do not meet the requirements of the implementing regulation for §207(e)(4), 29 C.F.R. §778.215(a)(4). Under §778.215(a)(4), contributions qualifying under §207(e)(4) must

be made to a trustee or third person, who assumes the usual fiduciary duties imposed by law. The statute, §207(e)(4), similarly requires that the payment be a contribution rather than a reimbursement payment. Once the City makes payment to Diversified to reimburse it for amounts paid to cover HRA expenses, the payment belongs to Diversified, rather than to an insurance fund or program that Diversified administers for the City. Diversified is not restricted in how it can use, and does not assume any fiduciary obligation on how to spend its own money. Payments made by the City to Diversified therefore do not meeting the requirements of §778.215(a)(4) and 207(e)(4).

The HRA payments are better characterized as indirect reimbursement of the Plaintiffs' already incurred medical *expenses*, rather than a contribution to a fund or program to provide future medical *insurance benefits*, over which the third party administrator would assume a fiduciary obligation. The far more analogous exemption is therefore §207(e)(2), which applies to the reimbursement of expenses. Under 29 C.F.R. §778.217(3), when an employer reimburses the employee for his every day expenses such as lunch or rent, the payments must be included in the employee's regular rate for overtime pay. Similarly, medical expenses are incurred by the employee for his own benefit; and not for the benefit of his employer; especially when the employer has not required the employee to incur any of the medical expenses. The HRA reimbursements therefore are personal expense reimbursements that must be included in the regular rate.

II.    The Notice of Claim Statute is Inapplicable to the Plaintiffs' §109.03(5) Wage Claim.

Pursuant to Wis. Stat. §893.80(1)(d), prior to commencing most types of litigation against a municipality, the claimant must file with the employer both a notice of injury, which describes

9

the circumstances surrounding the claim; and a notice of claim, which contains the address of the claimant and an itemized statement of the relief sought. However, the requirement of giving the municipal employer a notice of injury and a notice of claim is not absolute. When a more specific statute contains a procedure that is inconsistent with the notice of claim procedure, the more specific statutory procedure renders the notice of claim procedure inapplicable. *State re rel Auchenlach v. Town of La Grange*, 200 Wis. 2d 585, 596 (1996); *Oak Creek Citizens Action Committee v. City of Oak Creek*, 2007 WI App 196 ¶5-6; 304 Wis. 2d 702 (Ct. App. 2007) (Notice of claim requirement not applicable when it contravenes some other legislative mandate). Similarly, in this case the notice of claim requirement does not apply to the comprehensive statutory scheme to recover unpaid wages created by Chapter 109 when its application would frustrate important deadlines and policy objectives behind Chapter 109.

> a. Applying a Notice of Claim Requirement Would Remove the Municipal Employer's Incentive to Promptly Pay Owed Wages.

Pursuant to Wis. Stat. §109.11(2), an employer who fails to pay the full amount of wages owed to its employees is liable for up to 100% of the unpaid wages as liquidated damages if the claimant files his wage claim after exhausting all available DWD procedures; and 50% of the unpaid wages as liquidated damages if the wage claim is filed without exhausting DWD procedures. Liquidated damages are available so long as the aggrieved employee filed his wage claim prior to receiving full payment of owed wages. *Hubbard v. Messer*, 2003 WI 145 ¶35; 259 Wis. 2d 654 (2003). As interpreted by the Wisconsin Supreme Court, §109.11 creates a powerful incentive for the employer to promptly pay owed wages to its employees, so that the wages are paid before the employee files a wage claim against the employer, with its accompanying claim for liquidated damages. In *Hubbard*, the Wisconsin Supreme Court

10

recognized that the primary purpose of §109.11(2) was encouraging the prompt payment of wages; and interpreted the statute to create incentives for prompt payment. *See* 2003 WI 145 ¶28, 42. Wis. Stat. §109.03(1) similarly expresses the legislature's intent of encouraging the prompt payment of wages, by stating that in general wages must be paid to employees by no later than 31 days after they were earned.

On the other hand, if the notice of claim procedure applies to a §109.03 wage claim, then a municipality does not face any possibility of a lawsuit for unpaid wages accompanied by a demand for §109.11(2) liquidated damages until (a) the employee files a notice of claim with the municipality; and (b) the municipality disallows the claim either by issuing a notice of disallowance, or by taking no action for 120 days. Applying the notice of claim requirement to a §109.03 claim would allow the municipality to enjoy a time period of between 120 days (assuming the notice of claim is filed on the first day that the wage claim accrued) and 240 days (assuming the notice of claim is filed on the 120th day) during which it does not face any possibility of a lawsuit for unpaid wages. During that 120-240 day time period, and unlike a private employer, the municipality would have no incentive to pay the wages it owes to the employees. In fact, if a municipality can avoid liability for unpaid wages altogether if the employee does not file a timely notice of claim, it would have a perverse incentive to wait before paying owed wages, in the hope that its employee would either fail to recognize the underpayment of wages, or would fail to timely file the notice of claim for any other reason.

§109.03 is thus similar to the direct legislation statute at issue in *Oak Creek Citizens Action Committee v. City of Oak Creek*, 2007 WI App196 ¶9 n. 4; 304 Wis. 2d 702 (Ct. App. 2007). The direct legislation statute, Wis. Stat. §9.20, provides that once the clerk finds a

11

petition to be sufficient, the municipality must either pass the ordinance or submit the ordinance to the electors within 30 days. The Court held that §893.80 does not apply to §9.20, because to apply §893.80 would give the municipality up to 240 days, rather than the 30 days permitted by §9.20, during which it can process the petition without facing suit. *See* 2007 WI App 196 ¶9. *See also Little Sassabagama Lake Shore Homeowners Association v. Town of Edgewater*, 208 Wis. 2d 259, 266 (1997) (Notice of claim statute does not apply because requiring an aggrieved homeowner to wait up to 240 days before filing for review is inconsistent with the legislature's policy of resolving tax disputes promptly).

Similarly, Chapter 109 of the Wisconsin statutes creates a comprehensive statutory scheme for employees to recover unpaid wages. The goal of the legislature, as shown by both the payment deadline of §109.03(1) and the incentive for prompt payment of wages created by §109.11(2), is to encourage the prompt payment of wages to aggrieved employees. The goal equally applies to public and private employees, as shown by the explicit inclusion of the State and its political subdivisions in the definition of employers covered by the statute. *See* §109.01(2). Applying the notice of claim statute to Chapter 109 wage claims would give the municipality incentive to wait between 120 and 240 days before paying owed wages to its employees. The general notice of claim statute should not be applied to and destroy the specific goal of Chapter 109 to secure the prompt payment of wages for employees of public and private employers alike. *State re rel Auchenlach*, 200 Wis. 2d at 596.

        b.    <u>Imposing a Notice of Claim Requirement is Inconsistent with the Legislature's Goal of Providing a Wage Recovery for All Affected Employees.</u>

12

The notice of claim requirement does not apply to another statutory scheme when its application would frustrate another legislative goal. Such legislative goals include, but are not limited to, the prompt resolution of claims. *Nesbitt Farms LLC v. City of Madison*, 2003 WI App 122 ¶13, 265 Wis. 2d 422 (Ct. App. 2003). One of the goals of the Wisconsin legislature in enacting Chapter 109 is to ensure that all employees, not just the one who brought the claim, can achieve a full recovery of owed wages through the litigation of a wage claim.

In Chapter 109 the Wisconsin legislature created two separate procedures for initiating a wage claim: If an employee files a complaint with the DWD, DWD finds the claim to have merit, and the employer refused to pay the owed amount, the DWD may refer the matter to either a district attorney or the Department of Justice to file a wage claim in circuit court. See Wis. Stat. §109.11(1). On the other hand, the employee may also directly file a lawsuit for unpaid wages against his employer. Wis. Stat. §109.03(5).

§109.11(1)(b) explicitly provides that the DWD may audit an employer's records to discover all wage claims of the same type as the complaint it received. If the employee refused to pay all owed wages uncovered by the audit, the DWD may then refer the entire wage claim (i.e. on behalf of employees who have not yet consented to participate) to a district attorney or the Department of Justice to commence a lawsuit. See §109.11(1)(c). Such a lawsuit on behalf of persons who have not consented to participate would not be possible, if all affected persons must file a notice of claim under §893.80 prior to joining the lawsuit. This is because only those persons who explicitly consent can join in a notice of claim; so that a notice of claim on behalf of persons who have not explicitly consented to participate is invalid. *Hicks v. Milwaukee County*, 71 Wis. 2d 401, 407 (1976); *Carpenter v. Commissioner of Public Works*, 115 Wis. 2d 211, 217

13

(Ct. App. 1983) (Notice of claim inadequate when it does not show the employee filing the notice of claim was authorized to act on behalf of the class).

To the extent a notice of claim requirement is applicable to a statutory claim the State seeking to enforce the statute, just like a private plaintiff, must comply with the requirement. *State v. Town of Linn*, 205 Wis. 2d 426, 435 (Ct. App. 1996). The audit and lawsuit procedure of §109.11(1), which permits a wage lawsuit on behalf of employees who did not consent to participate, is fundamentally incompatible with the notice of claim procedure; so that the notice of claim procedure cannot apply to a Chapter 109 claim brought by the DWD. No court has ever interpreted a Wisconsin statute authorizing both governmental and private enforcement to mean that the notice of claim requirement is inapplicable to government enforcement, but applicable to private enforcement.

Moreover, the Wisconsin Supreme Court has explicitly held that the Wisconsin legislature intended for employee initiated wage claims to have the same scope, as the scope of actions that the DWD is authorized to pursue on the employee's behalf. *German v. Wisconsin DOT*, 235 Wis. 2d 576, 586 (2000). If the DWD can bring a Chapter 109 claim against a municipality on behalf of persons who have not yet consented to join the action, then so can the individual plaintiff. In a lawsuit against a private employer, a private plaintiff may file a class claim for unpaid wages on behalf of persons who have not expressly consented to join the claim. *DeKeyser v. Thyssenkrupp Waupaca Inc.*, 589 F. Supp. 2d 1026, 1031-1033 (E.D. WI. 2008); *Spoerle v. Kraft Foods Global*, 253 F.R.D. 434 (W.D. WI. 2007) (Both certifying opt-out Rule 23 classes for §109.03(5) wage claims). The notice of claim requirement, which requires the consent of each participating employee before notice and the subsequent lawsuit can be file don

14

their behalf, is therefore inapplicable to Chapter 109 claims brought by the DWD and private plaintiffs alike.

c.    <u>The Cost Shifting Provisions of the Notice of Claim Statute is Inconsistent with Wis. Stat. §109.03(6).</u>

§893.80(2) provides that if the municipality offers partial payment in response to a notice of claim, and the claimant who declines the offer ultimately recovers either the same amount, or an amount less than the offer, than the claimant owes to the municipality the costs of litigation. In contrast, under Wis. Stat. §109.03(6), a prevailing party is entitled to recover its costs and litigation expenses, only if the prevailing party is either an employee or the DWD. An employer therefore is not entitled to recover any of its costs of litigation for a §109.03(5) wage claim, regardless of its degree of success in the litigation.

The purpose of §109.03(6) is to ensure that the employee, after paying his attorney and the costs of litigation, still recover the full amount of wages owed to him. *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384, 401 (Ct. App. 1987). The intent of §109.03(6) to provide the employee with a full net wage recovery would be frustrated if an employee, who recovers some unpaid wages but less than the municipality's offer, would be required to pay the municipality's litigation costs. This case is thus like *Auchenleck,* 200 Wis. 2d at 594, where the Supreme Court held that the open records law is inconsistent with §893.80 in part because the open records law allows the requester to recover attorneys fees and costs regardless of the municipality's pre-suit offer; while §893.80(2) requires a claimant to pay costs to the municipality if he recovers less than the pre-suit offer.

In addition to the above stated inconsistencies between the notice of claim requirement and a §109.03(5) wage claim, §109.03(5) explicitly provides that an employer (thus including a

15

municipal employer, see Wis. Stat. §109.01(2)) may not by special contract with its employees, or by any other means, secure exemption from its obligation to pay the full amount of wages owed to its employees. The §893.80 procedure, as one way for the municipal employer to secure exemption from its obligation to pay the full amount of wages owed to its employees, is thus inconsistent with §109.03(5). Moreover, holding that a §109.03(5) wage claim is exempt from the notice of claim requirement would not frustrate the legislature's desire of giving municipalities an opportunity to compromise and budget for settlement, because the legislature more specifically provided in §109.03(5) that a wage claim cannot be privately compromised or settled. Wisconsin law requires the court to ignore any settlement, which results in the employee receiving less than the full amount of wages required by §109.03(5). *Spoerle v. Kraft Foods Global*, 614 F. 3d 427, 430 (7th Cir. 2010). There is no reason to give municipalities a notice of claim, and give it an opportunity to settle the dispute privately, when Chapter 109 wage claims cannot be settled privately without Court approval.

III.    <u>The Plaintiffs Have not Received the Full Amount of Wages Promised to Them</u>.

    a.    <u>The City of Sheboygan's Wage Deductions Violated Wis. Stat. §102.16(3)</u>.

The City of Sheboygan is self-insured for both health insurance and workers' compensation. (Proposed Facts, ¶14) For health insurance the City on an annual basis sets the premiums for the following year. (Proposed Facts, ¶16) Active employees pay for a share of the premium through payroll deduction. (Proposed Facts, ¶17) Other contributions towards health insurance costs are made by the City's departments who employ the active employees; as well as from retirees and COBRA participants receiving health insurance coverage. (Proposed Facts,

16

¶15)    The City also charges a premium to its departments to cover the costs of workers

compensation coverage. (Stipulated Facts ¶9)

During the years of 2011-2014, the City transferred $500,000, $1,622,864, $68,295, and

$173,218 respectively from the Health Insurance Fund into the Workers Compensation Fund.

(Proposed Facts, ¶24, 31, 36, 41)   Monies in the Workers Compensation Fund are used to pay for

the City's workers compensation expenses, including claims, excess insurance premiums, and

administrative costs. (Stipulated Facts, ¶10)   Moreover, the City has no way of tracking how

much of the transferred monies can be attributed to employee wage deductions. (Proposed Facts,

¶24) Wisconsin law explicitly prohibits using employee wage deductions, or for that matter any

other money contributed by or collected from employees, to cover the employer's workers

compensation premiums or expenses.  Wis. Stat. §102.16(3) provides:

> No employer subject to this chapter may solicit, receive, or collect any money
> from an employee or any other person or make any deduction from their wages,
> either directly or indirectly, for the purpose of discharging any liability under this
> chapter or recovering premiums…

An employer therefore may not make an indirect deduction from the wages of its employees for

the purpose of discharging its liability under the workers compensation statute.   When an

employer deducts monies from employee paychecks to cover health insurance costs, and then

transfers some of the deducted monies to the workers compensation fund, it has made an indirect

deduction of wages to pay workers' compensation premiums or benefits.  *See Chamberlain v.*

*Tampa*, 40 Fla. 74, 78 (Florida, 1898) (Where the City by statute is prohibited from collecting

additional taxes for general purposes, it cannot divert its surplus from a special assessment to pay

its general purpose expenses, because such a diversion would constitute an indirect collection of

taxes for general purposes); *Rohde-Giovanni v. Baumgert*, 2003 WI App 136 ¶17, 266 Wis. 2d

17

339 (Ct. App. 2003), affirmed by 2004 WI 27. (Child support statute that prohibits requiring fathers to pay child support for adult children would be rendered meaningless, if the wife can receive a higher level of maintenance on the ground that she needs the money to fund the education of the couple's adult child). Similarly, §102.16(3)'s prohibition against employee funding of employer workers' compensation expenses cannot be circumvented by the employer making wage deductions in the name of collecting health insurance premiums, and then transferring a portion of the deducted wages to its workers compensation fund.

The requirement by §102.16(3) that the wage deduction be for the purpose of discharging workers compensation liability is similarly satisfied. §102.16(3) by its plain language applies to indirect deductions for the purpose of funding workers compensation benefits. If an employer deducts wages from its employees and at the time of deduction intended to use deducted wages to pay workers compensation expenses, then it has made a wage deduction directly for the purpose of funding workers compensation, regardless of whether the money is first stored in a different fund before being transferred to a fund used to pay workers compensation expenses. For a wage deduction indirectly for the purpose of paying workers compensation expenses the purpose of using deducted wages to pay workers compensation expenses can be formed at the time deducted wages is diverted to pay workers compensation expenses, rather than earlier at the time of the wage deduction.

Moreover, in the same way the duty of good faith and fair dealing is implied into contracts, prohibition against surreptitious circumvention is implied into statutes. *West Allis School District v. DILHR*, 116 Wis. 2d 410, 423 (1984) (employer violated its obligation under the workers' compensation statutes to rehire the employee, when it rehired the employee with the

18

intention of subsequently terminating his position); *Janura v. Fencl*, 261 Wis. 2d 179, 189 (1952) (Statute should not be read so that its operation can be circumvented by subterfuge). A prohibition against deducting wages directly for the purpose of paying workers compensation expenses would apply to a scenario where the City intended all along to use deducted wages to pay workers compensation expenses, but in an effort to circumvent §102.16(3) transfers the deducted wages first to a legitimate fund, before transferring it to a fund where it can be used to pay workers compensation expenses. The separate prohibition against indirect wage deductions to fund workers compensation benefits is given meaning only when it is read to prohibit the later diversion of excess employee wage deductions, originally gathered in good faith, to fund workers compensation expenses. [1] The City violated §102.16(3) because at the time it diverted surplus employee wage deductions into the health insurance fund, it did so with the purpose that the diverted employee wages would be used to cover its workers compensation expenses, the only way that monies in the workers compensation fund can be used. (Stipulated Facts, ¶9)

Wisconsin statutes should not be narrowly construed in a manner to permit their circumvention, whether intentional or unintentional. *Erdman v. Jovoco*, 181 Wis. 2d 736, 751 (1994) (Wages within the meaning of Wis. Stat. §103.455 should not be narrowly construed to only include fixed compensation, because otherwise employers can pay their employees in a form other than fixed compensation, and then make unilateral deductions from the employees'

---

[1] The similar sentence structure of Wis. Stat. §119.70(2) supports the same conclusion. That section prohibits the appropriation of special tax monies, which were levied to pay for the use of school grounds for civic purposes, directly or indirectly for any other purpose. If the municipality collects money in the name of the school ground tax with immediate intent of using the money for an improper purpose, then it has appropriated the special tax monies directly for an improper purpose. The prohibition of indirect appropriation clearly applies to a scenario where the municipality initially collected the tax in good faith, but later diverted the tax to pay its other expenses. Just like for §119.70(2), §102.16(3) does not require the employer to have the intent to use deducted wages to pay workers compensation expenses at the time of deduction.

non-fixed compensation); *State Ex. Rel Lank v. Renztkowski*, 141 Wis. 2d 846, 854 (Ct. App. 1987) (Wisconsin open records law should not be read to permit less access to litigants against the public entity, because otherwise a non-litigant can rightfully demand the documents from the public entity, and then turn the documents over to the litigant). Similarly, §102.16(3) should be interpreted in a manner consistent with its obvious purpose: To prohibit employers from loading onto their employees the burden of financing workers compensation benefits, which the law declared to be the employer's responsibility. *Zimmerman v. Wis. Elec. Power Co.*, 38 Wis. 2d 626, 631-632 (1968). §102.16(3) cannot serve its intended purpose if employers can transfer surplus assets, originally deducted from employee paychecks, to pay workers compensation expenses: Employee wages and assets would have been used to fund workers compensation expenses, in violation of the legislature's intent, regardless of whether the employer formed the purpose to fund workers compensation at the time of wage deduction, or later when the deducted wages were diverted to pay workers compensation expenses. The purpose requirement of §102.16(3) should be read as protection against an employer who accidentally diverted employee monies to pay workers compensation expenses[2]; rather than a license for the employer to overcharge its employees for services, and then divert the surplus to fund its workers compensation program.

       b.    <u>There is Substantial Evidence that the City Over Charged Health Insurance Premiums for the Purpose of Funding its Workers Compensation Program.</u>

---

[2] An employer or employer representative who violates §102.16(3) faces significant penalties in the form of a fine of up to $100 per day for a first offense, and imprisonment of up to 90 days plus a fine of up to $2,000 for a second offense. See Wis. Stat. §102.85, 102.88. The purpose of requirement of §102.16(3) protects the employer who makes an honest mistake in using employee monies towards workers compensation expenses from the fines and imprisonment provided by the statute.

The City employs an underwriter, M3, to provide calculations and advice for setting its health insurance premiums for the following year. (Proposed Facts, ¶18) In 2010, M3 projected that the City's total expenditure for health insurance for 2011 would be approximately $7 million; and that the City would raise approximately $8 million by maintaining its current insurance rates. (Proposed Facts, ¶19) The M3 underwriter's recommendation was that the City keep its health insurance premiums the same. (Id.) The City instead increased its health insurance premiums by 10%, so that projected health insurance premiums would be approximately $1.8 million dollars, rather than $1 million dollars higher than its projected health insurance expenditures.[3] (Proposed Facts, ¶20) As the underwriting unequivocally testified at the Rule 30(b)(6) deposition of M3, there would be no reason for the City to increase its health insurance premiums for 2011, if its sole concern was to ensure that its health insurance program was adequately funded. (Proposed Facts, ¶21)

The City's real intent for increasing its health insurance premium for 2011 can be understood from statements in its Annual Financial Report, as well as the inadequate amounts that it charged its various departments for workers compensation expenses. Each of the City's audited financial statements between the years of 2010 and 2014 contains the following statement:

> All Funds of the City participate in the risk management program. Amounts payable to the self service funds are based on actuarial estimates of the amounts necessary to pay prior and current year claims and to establish a reserve for catastrophic losses. $_____ was available for that reserve at year end, and is included in the unrestricted net position of the internal service funds.

---

[3] If current funding rates can raise $8 million, increasing the funding rate by 10% would increase the amount raised by 10% to about $8.8 million.

The amount of money listed as available for the reserve equals the combined year end account balance of the health insurance fund, the workers compensation fund, and the general liability self insurance fund. (Proposed Facts, ¶25) The City in other words looks at the assets of its self insurance funds as a whole, so that it needs to raise enough money to fund shortages in any of the three funds. The City's intent of using other sources to fund workers compensation benefits is further revealed by comparing the City's workers compensation expenditure one year with the amount that it charges its various departments to pay workers compensation benefits during the following year:

| Year | Worker Comp Expenditure Prior Year | Charges for Workers Comp Current Year | Differential |
|------|------|------|------|
| 2011 | $472,196 | $80,586 | -$391,610 |
| 2012 | $409,413 | $338,881 | -$70,532 |
| 2013 | $490,922 | $465,086 | -$25,836 |
| 2014 | $487,273 | $464,416 | -$22,857 |

Proposed Facts ¶23, 30, 35, 40, 42. On the other hand, during each year between 2011 and 2014 the City charged its departments and employees a health insurance premium that was projected to raise more money, than its projected health insurance expenditures for the year. (Proposed Facts, ¶19-20, 26, 28, 33, 38).

Specifically, for the year 2011 the City charged health insurance premiums that was projected to raise about $1.8 million more than its projected health insurance expenditures for the year, while charging workers compensation premiums that was projected to raise about $400,000 less than the amount that it paid to cover its workers compensation expenditures during the prior

22

year. No reasonable fact finder can find that the City could have in good faith concluded in 2010 that $80,596 would be sufficient to cover its workers compensation expenses in 2011, given that its actual workers compensation expenditures for each year between 2011 and 2014 exceeded $400,000. (Proposed Facts ¶23, 30, 35, 40) The only reasonable conclusion from the evidence is that the City charged its employees and departments a higher health insurance premium in 2011, so that it can cover the expected shortfall in workers compensation expenses. In other words, in 2011 the City deducted employee wages for the purpose, formed at the time of the deduction, of covering its anticipated workers compensation liability. Indeed, at the end of 2011 the City made up for the shortfall in its workers compensation fund by transferring $500,000 from the health insurance fund. (Proposed Facts, ¶24)

The City's decision to charge its employees a higher health insurance premium in 2011 had a domino effect in future years. If the City had kept insurance premiums the same, rather than increase them for 2011, M3 would have also recommended to keep the premiums the same (or 10% less than the amounts the City actually charged) for 2012. (Proposed Facts, ¶26, 27) Similarly, for 2013 and 2014 M3 recommended for the City to keep charging the same inflated premium as it had for previous years, even though that premium was projected to raise 4%-5% more money, than the City needed to cover its anticipated health insurance premiums. (Proposed Facts, ¶33, 38). Given that M3 was comfortable recommending no premium increase if projected expenditures was only 1% lower than projected revenues (Proposed Facts ¶37); had the premium been lower in 2012 the employees also would have been charged lower premiums for 2013 and 2014. The City's continued practice of charging its departments lower workers compensation premiums than its workers compensation premiums the previous year shows that it

23

intended to use another source, namely the health insurance fund and monies transferred from the health insurance fund, to cover the shortfall.

      c.      <u>The City has Thereby Underpaid the Amount of Wages Promised to Employees</u>.

Since employee wages cannot be used to pay workers' compensation premium benefits, deductions from the employees' paychecks that were then used for the purpose of funding workers compensation premiums or benefits, cannot constitute bona fide payment of wages to the employee. *Miree Construction Corp. v. Dole,* 930 F. 2d 1536, 1545-1546 (11th Cir. 1992) (Since employee income from a Davis-Bacon project cannot be used to fund fringe benefits for work on non Davis-Bacon projects, contributions towards non Davis-Bacon projects cannot count as prevailing wages paid to the employee); *IBEW v. Aubry*, 41 Cal App. 4th. 1632 (Ct. App. 1996) (Wage deductions used to pay employers as a part of a job targeting program cannot constitute prevailing wages paid to employees, given that wages paid to employees cannot be kicked back to the employer). *See also Tom Mistick & Sons v. Reich*, 54 F. 3d 900, 906 (D.C. Cir. 1995) (Deductions for work related employer expenses cannot count as prevailing wages paid to employees).

Wisconsin law requires timely payment to the employee of all wages earned by him during each pay period. Wis. Stat. §109.03(1). Employees can therefore enforce their right to the full amount of compensation promised by their contracts through §109.03(1) and (5). *Jackson v. WMAC Inv. Corp.*, 809 F. 2d 377 (7th Cir. 1987) (Employee entitled to cash payment required by his deferred compensation plan); *Wink v. Miller Compressing Co*., 2015 U.S. Dist. Lexis 70491 *23 (E.D. WI. 2015) (Employee entitled to severance pay provided by her contract of employment if she was terminated rather than quit). Paying an employee at a rate lower than

24

the one agreed upon between the parties violates §109.03. *Lynch v. Crossroads Counseling*, 2004 WI App. 114 ¶20; 275 Wis. 2d 171 (Ct. App. 2004).

In this case, the plaintiffs were guaranteed a wage rate for the following year either by the collective bargaining agreements that they were covered by, or by their annual reviews. (Stipulated Facts, ¶10-11) In each case the employee entered into an enforceable agreement with his employer by continuing to work for the City. *Carroll v. Stryker Corp.*, 658 F. 3d 675, 683 (7th Cir. 2011) (Employee accepted compensation plan by performing under its terms, even though he never signed the contract). The City was therefore required by §109.03(1) and (5) to pay the contractually required wages to the Plaintiffs.

Wage deductions that was then used for the purpose of paying workers compensation expenses in violation of §102.16(3) cannot constitute bona fide payment of wages to the Plaintiffs. Health insurance contributions are deducted out of the first two employee paychecks each month. (Proposed Facts, ¶43) Once a portion of the wage deductions are diverted to workers compensation expenses, the employee is no longer receiving the full amount of wages promised by his collective bargaining agreement or annual review.

When an employer commingles employer and employee contributions into a single fund, none of the money in the fund can be used to pay for workers compensation premiums or benefits. *Novetny v. City of Omaha*, 207 Neb. 535, 539-540 (1980) (None of the payments made by the City out of a commingled fund can be used to offset its liability to pay workers compensation benefits to the plaintiff). Similarly, the City of Sheboygan commingled employer and employee contributions in its health insurance fund, so that it is impossible to track how much of the money transferred to the workers compensation fund can be attributed to employee

25

wage deductions. (Proposed Facts, ¶24) Since none of the money in the health insurance fund can be transferred to pay workers' compensation benefits, the Court should presume that all monies transferred to the workers compensation fund to the extent possible can be attributed to employee wage deductions. There is no other way to ensure that employee wage deductions are not used to pay for workers compensation premiums or benefits, as prohibited by §102.16(3). When the City transferred employee wage deductions to the workers compensation fund, those wage deductions can no longer constitute payment of wages to its employees; thus resulting in an underpayment of wages to the Plaintiffs in violation of Wis. Stat. §109.03(1) and (5).

Even if the Court does not presume that every possible dollar transferred to the workers compensation fund can be attributed to employee wage deductions, employee wage deductions constitute around 10% of the health insurance premiums paid to the City each year. (Stipulated Facts, ¶12) Given that the City has no way of tracking whether monies transferred to the workers compensation fund came from employee contributions (Proposed Facts, ¶24), it is fair to presume that a portion of the monies transferred to the workers compensation fund can be attributed to employee wage deductions; so that employees such as named plaintiffs Walsh and Gilbertson did not receive the full amount of wages required by their employment agreements.

4.     Conclusion.

For the above stated reasons, the Plaintiffs are entitled to summary judgment on liability for both their overtime pay calculation claim, and their Wisconsin law wage claim.

Dated this 23rd day of November, 2015.

THE PREVIANT LAW FIRM, S.C.
s/Yingtao Ho_____
Yingtao Ho
State Bar Number 1045418

26

1555 North River Center Drive
Suite 202
Milwaukee, WI 53212
Attorneys for Plaintiffs