UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**DANIEL GILBERTSON,**
**MATTHEW WALSH, and**
**MATTHEW BRAESCH,**

**On behalf of Themselves and All Others Sharing**
**Questions of Common and General Interest,**

   Plaintiffs,

v.                       **Case No. 2:15-cv-00139**

**CITY OF SHEBOYGAN,**

   Defendant.

---

**REPLY BRIEF IN SUPPORT OF DEFENDANT CITY OF SHEBOYGAN'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Alan M. Levy
Wisconsin State Bar No. 1010285
Oyvind Wistrom
Wisconsin State Bar No. 1024964
Attorneys for Defendant, City of Sheboygan
LINDNER & MARSACK, S.C.
411 E. Wisconsin Avenue, Suite 1800
Milwaukee, WI 53202
Telephone: (414) 273-3910
Fax: (414) 273-0522
Email: alevy@lindner-marsack.com
Email: owistrom@lindner-marsack.com

# INTRODUCTION

The principal issues in this care are:

1. Whether Plaintiffs' failure to file any notice of claim pursuant to Wis. Stat. § 893.80 bars this action?

2. Whether the City's bonus payments upon annual performance reviews are part of the employee's "regular rate" of pay for purposes of calculating overtime premium payments?

3. Whether reimbursements of medical expenses pursuant to a Health Reimbursement Arrangement ("HRA") benefit program are part of the employee's "regular rate" of pay for purpose of calculating overtime premium payments?

4. Whether funds which the City originally budgeted for its self-insured employee health benefits can be used to supplement the originally budgeted amount for its self-insured worker compensation benefits?

Defendant City of Sheboygan (the "City") has already acknowledged that annual bonuses paid for educational degrees and for monthly payments to those who waived employee health benefits should have been included in its overtime calculations. Plaintiffs may well have been able to resolve those issues without litigation if they had first presented them in a Notice of Claim. Failure to preface these and all other claims with adequate notice should bar recovery for them now.

The bonuses and other payments which remain in dispute have already been the subjects of two rounds of briefing, and, without waiving its earlier defenses, the City will seek to avoid unnecessary repetition by revisiting again here its earlier arguments about established principles, and will focus this Reply Brief on points which remain in dispute at this point.

## I. PLAINTIFFS' LAWSUIT IS BARRED BY THEIR FAILURE TO COMPLY WITH WISCONSIN'S NOTICE OF CLAIM REQUIREMENT.

The notice of claim requirement under Wis. Stat. § 893.80 constitutes a condition precedent to pursuit of any wage claim against a governmental employer. Plaintiff's noncompliance with the notice of claim provision bars their recovery in this litigation. This requirement has been enacted to allow governmental employers an opportunity to make a prompt investigation. *Pattermann v. City of Whitewater*, 32 Wis. 2d 350, 353, 145 N.W.2d 705 (1966). Then, if the government concludes that liability exists, it can settle the claim and avoid unnecessary costs and expenses associated with litigation. If, on the other hand, the government concludes that no liability exists, it can disallow the claim.[1]

In their brief, Plaintiffs urge this Court to adopt an exception to the notice of claim requirement for wage claims filed under Chapter 109. In order to qualify for what has always been a rare exception to § 893.80, the courts must examine whether: (1) "there is a specific statutory scheme for which the plaintiff seeks exemption"; (2) enforcement of § 893.80 would hinder a legislative preference for prompt resolution of the type of claim under consideration; and (3) the purpose for which § 893.80 was enacted would be furthered by requiring that a notice of claim be filed. *Town of Burke v. City of Madison,* 225 Wis. 2d 615, 625, 593 N.W.2d 822 (Ct. App. 1999). Plaintiffs' claim fails to meet any of the elements of this test and should be dismissed.

First, Plaintiffs argue that the notice of claim requirement conflicts with the statutory scheme of Chapter 109. (Pltfs.' Memo in Opp. to Def's Mo. for S.J., Doc. 32, p. 10). However, the notice of claim requirement conflicts with a separate statutory scheme only when the separate statutory scheme contains a more restrictive time limit than the 120-day notice contained in §

---

[1] Michael J. Waldspurger, *Ameliorating the Harsh Effects of Wisconsin's Municipal Notice of Claim Statute*, 77 Marq. L. Rev. 610 (1994).

3

893.80.  For example, exceptions to § 893.80 have been granted when specific statutes provide for immediate injunctive relief.  *See Gillen v City of Neenah,* 219 Wis. 2d 806, 822, 580 N.W.2d 628 (1998).  Chapter 109 does not provide for immediate injunctive relief, nor does it specify any other *more* specific statutory scheme on which Plaintiffs can rely.  Plaintiffs are simply using the legislature's purpose in enacting Chapter 109, i.e. the "prompt" payment of wages, as a restrictive time limitation.  (Memo, Doc. 32, p. 11).  Arguing that prompt payment of wages equates to a remedy of immediate injunctive relief, as in the case of Wis. Stat. § 30.294 at issue in *Gillen*, does not create the exception.  Had the Legislature intended to provide an immediate remedy for wage claims under Chapter 109, they would have included such a provision in the statute.  The omission of any specific time limitation in Chapter 109 can only be interpreted as a deliberate omission by the Legislature.  *See generally: Water Quality Ass'n Employees' Benefit Corp. v. U.S.,* 795 F.2d 1303, 1307-1308 (7th Cir. 1986).  There is not a more specific time limitation in Chapter 109 on which Plaintiffs can base their exception to § 893.80, and their claim must be dismissed.

   Next, Plaintiffs argue that applying § 893.80 hinders the legislative intent behind Chapter 109.  Plaintiffs claim that Chapter 109 provides for the prompt payment of wages whereas, they contend, the notice of claim statute incentivizes governmental employers to wait at least 120 days to pay owed wages, which Plaintiffs construe to be a direct contradiction of Chapter 109's legislative intent.  Plaintiffs fail to appreciate that claims are typically filed under Chapter 109 when a governmental employer legitimately disputes the wages owed.  This is particularly true when, as here, nonpayment is due to a policy issue or a statutory interpretation instead of a fact question such as the calculation of an undisputed entitlement.  By applying the 120-day notice requirement, employees are afforded a faster investigation of their wage claim than may occur

4

under Chapter 109's two year statute of limitations.  As such, § 893.80 actually furthers, as opposed to hinders, the legislative intent behind Chapter 109 by ensuring immediate investigation of claims.

Finally, Plaintiffs argue that the legislative intent behind § 893.80 is not furthered by applying it to Chapter 109.  Plaintiffs argue that because § 109.03(5) does not permit the private settlement of wage claims for less than the full amount of the claim, there is no reason for a 120-day notice requirement for wage claims.  (Doc. 32, p. 13). Plaintiffs are twisting the language of § 109.03(5), which states that "no employer may by special contract with its employees, or by any other means, secure exemption from this section."  Wis. Stat. §109.03(5).  Rather, nothing in the language of section 109.03(5) prohibits the parties from reaching a private resolution of the claim prior to litigation.

Plaintiffs cite *Spoerle v. Kraft Foods Global, Inc.*, 614 F.3d 427 (7th Cir. 2010), in support of their argument that § 109.03(5) does not allow private settlements for less than the full value of the claim.  However, *Spoerle* stands for the proposition that an employer cannot exempt itself from state law requirements through the execution of a collective bargaining agreement. 614 F.3d at 430.  For example, a collective bargaining agreement in Wisconsin which set a wage of $7.00 per hour would undercut but the minimum wage in Wisconsin, which is $7.25 per hour. *Spoerle* rejects the argument that a collective bargaining agreement can exempt itself from state laws of general application, such as a minimum wage requirement.  614 F.3d at 430.  The Seventh Circuit's rationale is a far cry from Plaintiff's argument that individual wage claims can never be settled under Chapter 109 unless the employer pays the full value of the claim, and Plaintiffs cite no other precedent in furtherance of their proposition.

5

Freedom of contract allows parties to reach private settlements of litigation, and Chapter 109 is no exception. Justice John Paul Stevens explained "[i]n labor disputes, as in other kinds of litigation, even a bad settlement may be more advantageous in the long run than a good lawsuit." *Air Line Pilots Ass'n Intern. v. O'Neill,* 499 U.S. 65, 81 (1991). Accordingly, Plaintiffs' argument that no private settlements can be reached under Chapter 109 for less than the full value of the claim to justify exemption of § 893.80, is without merit.

The policy justifications behind the notice of claim requirement are compelling and should be upheld in this case. The Wisconsin Supreme Court underscored the importance of section 893.80 when it stated:

> Statutory…provisions requiring presentation of claims or demand to the governing body of the municipal corporation before an action is instituted are in furtherance of a public policy to prevent needless litigation and to save unnecessary expenses and costs by affording an opportunity amicably to adjust all claims against municipal corporations before suit is brought.

*Pattermann v. City of Whitewater,* 32 Wis. 2d 350, 357, 145 N.W.2d 705 (1966), citing 38 Am.Jur., Municipal Corporations, P. 383, sec. 674. To allow Plaintiffs' claims to be brought despite the failure to comply with § 893.80 would be contrary to state law and precedent.

## II. DISCRETIONARY PAYMENTS ARE NOT PART OF AN EMPLOYEE'S "REGULAR RATE OF PAY."

The City has instituted a compensation plan which allows supervisors to move employees to the top of their job classification's wage range, applying those increases to work performed after their anniversary date based on evaluation of their performance in the year prior to that anniversary date. Those raises are part of an employee's regular rate of pay for purposes of calculating overtime premiums for work performed after being determined in the evaluation process.

6

Some employees are already at or near the top of the pay range for their job classification when given their annual evaluation. The compensation plan does not allow them to exceed that range (unless already there when the plan was adopted). Those employees may receive a one-time bonus in the paycheck after their anniversary if the supervisor considers that their past year's performance warrants it. The bonus is not related to earnings after it is paid because the employee receives the entire amount whether he/she remains employed a day, a week, or a year after its payment. (Ho Ex. 2, pp. 14-17, Doc. 29-2; Ex. 4, pp. 14-15, Doc. 29-4; Rohrick Depo., Ho Ex. 1, p. 170, line 24 - p. 172, line 3, Doc. 29-1.) If the employee receives no bonus the following year, the earlier one does not continue in any way. There is no compounding effect, and it is never "automatic." (Ho Ex. 2, p. 15, Doc. 29-2.)

The principal test for whether such a bonus should be included in overtime calculations is whether it is a discretionary grant or some sort of entitlement. This structure is not like those in the cases Plaintiffs cite. The City made no promise of a bonus if a particular business goal was reached, *Gonzalez v. McNeil Tech. Inc.*, 2007 U.S. Dist. Lexis 27262 *13; 2007 WL 1097887 (E.D. VA. 2007). The promise of a bonus for reaching a goal is like a contract, and people enter such relationships with the expectation that some objective standard will be followed, even if vulnerable to some intervening external factor (e.g., loss of a large customer, weather disaster). The employer's promise to observe the objective goal eliminates the discretion which supports exclusion from the "regular rate" of pay. *Id.*, 2007 WL 1097887*4. As Plaintiffs have acknowledged, a payment which is made regardless of hours worked, wages earned, or employee efficiency is excluded from the "regular rate of pay," *Moreau v. Klevenhagen*, 956 F.2d 516, 521 (5th Cir. 1992). The bonus here is paid for general work quality, not number of hours worked, wages earned, or some quota of production or revenue, so it, too, should be excluded from

7

overtime calculation. *Compare: Wang v. Chinese Daily News*, 435 F. Supp. 2d 1042 (C.D. Ca. 2006), vacated on other grounds, 132 S. Ct. 74 (2011). Again, a bonus assured for accomplishment of a specific result is to be part of the "regular rate," but a bonus which is not based on a *quid pro quo* of meeting an objective goal is a discretionary decision.[2]

In the end, the City's bonuses were the result of supervisory discretion. A bonus was only available to those already at the top of their job classification wage rate, it did not depend on hours or specific objectives, it was to be disbursed in the paycheck following annual evaluation and hiring anniversary, it was not automatic, and it could not be paid unless the supervisor considered the employee's evaluation to warrant it. Even if poor performance led to an improvement plan, there was no assurance that a bonus would be given at any particular point during that plan; if the supervisor did not find the subsequent performance adequate, no bonus was given. The improvement plan might state objective criteria to warrant a bonus, but those criteria could be determined *ad hoc* by the supervisor, and without any assurance of their administration. This was not a promised benefit assured to be part of annual compensation and, thus, it was not part of the regular rate of pay.

### III. HRA REIMBURSEMENT BENEFITS WERE THE PRODUCT OF AN EMPLOYEE BENEFIT PLAN EXCLUDED FROM THE "REGULAR RATE."

The parties have both cited 29 U.S.C. § 207(e) and 29 C.F.R. § 778.215 as the touchstones for determining whether payments from the employer's HRA program to the employee are part of the employee's regular rate. That both parties rely on the same provisions demonstrates the lack of clear guidance within those provisions or any other source of legal

---

[2] Plaintiffs cite *Hoas v. Verizon New York*, 2015 U.S. Dist. Lexis 107842 *67-68 (S.D. N.Y. 2015) for the proposition that manager bonuses must be included in regular rate calculations. (Pltfs.' 12/23/15 Memorandum, Doc. 32, p. 6.) This appears to be the same decision as *Haas v. Verizon New York, Inc.*, 2015 WL 5785023, 166 Lab. Cas. P. 36, 388. The latter's Footnote 1, indicates that bonuses already obtained are to be included in determining whether a person is a highly compensated employee exempt from FLSA overtime because of the resulting annual salary above $100,000.00; it did not address the detailed basis for determining whether the bonus was to be excluded under the discretionary standard.

8

precedent.  The HRA program is no longer in operation, but Plaintiffs seek a not-yet ascertained overtime payment for years during which they received the benefit.

Plaintiffs contend that an HRA can be excluded from wages only if the employer first funds the program with irrevocable payments to a trust or other third person, and that third party then uses that account to reimburse the employee for an otherwise eligible medical expense. They cite a November 22, 1985 opinion by a Department of Labor Branch Chief who said the employer's contribution "for health insurance or similar benefit must be paid irrevocably to a trust or third person pursuant to an insurance agreement, trust, or other funded arrangement." 1985 DOLWH Lexis 13.  Their only other authority is *Adoma v. University of Phoenix, Inc.*, 779 F. Supp. 2d 1126 (E.D. Cal. 2011), which held that living expenses for the benefit of the employee (e.g., meals, dormitory rooms, or equipment not primarily provided to assure the employer's access to the employee) are part of the employee's remuneration, *Id.*, at 1134-1135. This contrasts with pay for performance or attendance.  The HRA reimbursements do not present this juxtaposition.

> The key point is that the pay or salary is compensation paid for work . . .

*Id.*, 1133 (citations omitted).  Money received as reimbursement of medical expenses unrelated to any question of work or attendance is not compensation for work.

The use of self-insurance should not change any of this.  The City's HRA program used a third party which adjudicated claims and advanced their payment only because the City had assured it would, in turn, receive immediate reimbursement.  The impact on the employee was the same whether the conduit between the plan sponsor and the plan participant was a prefunded account administered by a third party or by a third party with a contract which assured ultimate payment by the City for all claims.

9

Plaintiffs' argument against the self-insurance model ignores the difference between public and private employment. A private employer puts health benefit funding into the equivalent of an irrevocable trust so that those contributions are not part of its taxable revenue, but a municipality is entirely tax-exempt, so it does not have that reason to deposit funds before they are needed to pay claims. The employee does not receive remuneration – whether or not part of his/her regular rate of pay – until a claim is paid. The payment is for medical treatment, not performance of work.

The question is whether payment of that medical claim is like payment of dormitory rent or meal expense for the employer's convenience or income to the employee in return for work performance. Whatever it is, the payment cannot be remuneration of any kind until it is paid, regardless who holds its funding before that payment. The reality is that FLSA does not treat the payment to the fund as remuneration because the employee does not control or receive it until a medical claim is made, and it is that lack of receipt of payment by the employee which separates it from the regular rate of pay. When the employee does receive a payment, it is not based on a service he/she has rendered; it is only paid if a medical need warrants it.

## IV. THE PURCHASE OF HEALTH COVERAGE DOES NOT CREATE A PERSONAL ASSET IN A BENEFIT PROGRAM WHICH CAN ONLY BE USED AS THAT PURCHASER WISHES.

Plaintiffs and their fellow employees pay a portion of the anticipated cost of the City's self-insured health benefit through a payroll deduction equal to approximately ten percent (10%) of that cost. That benefit is the City's promise to pay for medical costs for its participants. If the participant presents claims in excess of whatever he and the City share in their equivalent of premiums, the claims are still paid in full. At the same time,

10

Case 2:15-cv-00139-PP    Filed 01/12/16    Page 10 of 15    Document 35

> Q. . . . if at the end of the year his claims are less than all the premiums made plus the deductible, he gets nothing back, does he?
>
> A. No.
>
> Q. Well, then what has he gotten for his money?
>
> A. Coverage for potential loss.
>
> > [Plaintiff] Mr. Gilbertson: Just like car insurance.
> > The Witness [James M. Amodeo]: If you go out and you buy car insurance, you may never need it. One time you do. You're buying coverage for 12 months.

(Amodeo Depo., Ho Ex. 6, p. 66, line 17 – p. 67, line 1, Doc. 29-6.)

The payroll deductions here were not for a 401(k) retirement plan or a savings account which the employee could expect would return his contributions to him at career-end. These payments were for coverage, for protection, and Plaintiff Gilbertson himself volunteered his agreement with that.

If the plan were an insurance policy, no one would expect to have a claim for any money not used for payment claims. If the City used any portion of the health plan income to pay for road repair or fire protection, like the insurance company using its profits elsewhere, no one would expect a rebate of the premiums.

But Plaintiffs claim that the City cannot use any part of this money for payment of worker compensation benefits, so – after speculating on what portion of such a fund transfer could be attributed to employee health benefit payments – the "employee's share" must be returned. The law has no such requirement.

To bolster their contention, Plaintiffs start with citations to decisions totally unrelated to the rule against requiring an employee to pay for part of the worker compensation benefit. *Chamberlain v. City of Tampa*, 40 FLA 74, 23 So. 572 (1898) is an almost ancient statement that

11

a property tax levy created and enforced for a "special purpose" cannot be used for anything else; there is no comparable restriction on the City's budget allocation for its employee health plan. Again, the restriction on use of health benefit funds is not a "special purpose" for the health program.

*Marriage of Rohde-Giovanni v. Baumgert*, 2003 WI App 136, 266 Wis. 2d 339, 667 N.W.2d 718, aff'd 2004 WI 27, 269 Wis. 2d 598, 676 N.W.2d 452 is equally inapplicable; it involved a martial property issue about the propriety of requiring education expenses as child support when that child is an adult, not anything to do with worker compensation. *West Allis School Dist. v. DILHR*, 116 Wis. 2d 410, 342 N.W.2d 415 (1984), held that a *pro forma* rehiring after a compensable injury followed by discharge within less than one month was a sham which violated the worker compensation law's requirement of reasonable cause to refuse a rehiring; the decision does not mention payments by an employee for worker compensation coverage. *Zimmerman v. Wisconsin Electric Power Co.*, 38 Wis. 2d 626, 157 N.W.2d 648 (1968) also dealt with an unrelated part of the worker compensation system: whether its exclusive remedy provision prevents bringing a tort action against a fellow servant, *Id.*, 649; again, employee payments for benefits were not an issue there.

Having recited a legal theory for which they have no direct precedent, Plaintiffs then explicate their "conspiracy theory" that the City deliberately inflated the health benefit premium rates in order to create a subsidy for its worker compensation benefit. Whatever else Plaintiffs may say about separate accounts, physical transfers, and imperfect budget allocations, the fact which cannot be challenged is that the annual "premium" rates were established on the advice of outside consultants who never supported reducing those rates – not even when a run of good fortune caused lower claims cost experience than had been anticipated.

12

The City's Human Resources Director testified that its dental insurance premium was recommended by Robert Karp, whom she understood to be an "actuary" from "an outside company." (Rohrick Depo., Ho Ex. 1, p. 137, Doc. 29-1.) The same was true of the City's "health and wellness benefits." (*Id*.) Based on this advice, the City "kept the premiums constant" from 2011 until 2015, when it decreased them "in moving to a high deductible plan." (*Id*., p. 140.) The premium was kept the same even when it collected more than necessary to cover annual costs because of fear of "potentially high-costing claims" and concern that the City had just "got lucky that employees were healthy." (*Id*., p. 141.) The consultant/broker, and the actuary through the broker, told the City it "should be cautious on reducing the rates because a bad year was most likely, it's not just going to be continued good health . . . ." (*Id*.; pp. 141-143.)

Robert Karp, who made the calculations about which the Human Resources Director spoke, consistently recommended keeping the same premium instead of adopting any decrease. (Karp Depo., Ho Ex. 10, pp. 41-44, Doc. 29-10; see also: pp. 52-54, 60-61, 65-66, 70.) After reviewing examples of fund costs less than reserves, Mr. Karp, having cited concerns about medical inflation, uncertainty of future costs, and a preference for stability, testified:

> . . . there is no need to change the funding.

(*Id*., p. 52, lines 18-19.) He included both increases and decreases of premium rates in this position. (*Id*., p. 52, lines 21-p. 53, line 3; see also: pp. 60-61.) (When the claims ratio indicated claims made were lower than reserves in 2012, Karp still did not suggest reducing rates because of his questions about the data given him by a prior administrator. (*Id*., pp. 64-67.)) "I made a recommendation to the account executive [the consultant who interfaced with the City] that the client maintain their existing funding, basically take no action." (*Id*., p. 70, lines 15-17.)

13

As important, Karp never considered the City's worker compensation program or any payments to it when making those calculations and recommendations.

> Q. . . . did you ever take into consideration what was happening with worker compensation claims with the City of Sheboygan?
>
> A. No, sir.

(*Id.*, p. 89, lines 2-5.)

Plaintiffs' speculation that the City manipulated employee payments for health benefits intentionally to create a surplus which would then subsidize the worker compensation program has no basis in fact or law. The health premium rates – regardless whether alternatives were available – were the best advice of that outside consultancy and the City's reasonable and conscientious perception of that advice. There is no evidence that the rates were in any way improper. Finally, the employees had neither a right nor an expectation that they had any claim to their own premium payments other than the coverage which they received.

## **CONCLUSION**

For the reasons set forth above, as well as those offered in its earlier findings, the City of Sheboygan requests that the Court:

1. Grant summary judgment for the City and against the Plaintiffs in this action;

2. Dismiss the Complaint with prejudice and in its entirety;

3. Order the reimbursement of the costs and reasonable attorney fees which the City has incurred in its defense of this litigation; and

4. Grant such other and further relief as it may deem necessary and/or appropriate.

14

Dated at Milwaukee, Wisconsin this 12th day of January, 2016.

        Respectfully submitted,

        **LINDNER & MARSACK, S.C.,**
        Attorneys for the Defendant, City of Sheboygan

By:    s/Alan M. Levy
       Alan M. Levy
       State Bar No. 1010285
       Oyvind Wistrom
       State Bar No. 1024964
       411 E. Wisconsin Avenue, Suite 1800
       Milwaukee, WI 53202
       (414) 273-3910
       (414) 273-0522 (FAX)
       alevy@lindner-marsack.com
       owistrom@lindner-marsack.com